IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WINDY CITY LIMOUSINE COMPANY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CINCINNATI FINANCIAL CORPORATION, et al., <br><br> Defendants. | No. 20-cv-04901 <br><br> Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Plaintiff Windy City Limousine Company, LLC ("WCL") owns and operates a private, for-hire transportation business. After it was forced to suspend its business operations to combat the spread of the COVID-19 virus, WCL sought indemnification for its losses pursuant to the insurance policy it maintained with Defendants Cincinnati Financial Corporation, the Cincinnati Insurance Company, the Cincinnati Casualty Company, and the Cincinnati Indemnity Company (collectively, "Cincinnati"). Cincinnati denied WCL's claim. As a result, WCL brought the present action against Cincinnati and Defendant Valley Companies, Inc. ("Valley") in Illinois state court, seeking a declaration that Cincinnati is obligated to cover WCL's COVID-19-related business losses. The action was removed to this Court. Now, WCL has filed a motion to remand the action back to state court (Dkt. No. 18), and Cincinnati and Valley have each filed motions to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (Dkt. Nos. 11, 14.) For the

---

[1] Originally, Cincinnati also moved to dismiss the case for improper service of process pursuant to Federal Rule of Civil Procedure 12(b)(5). Specifically, it argued that WCL had not properly served Cincinnati but instead served the office of a company it incorrectly believed to be Cincinnati's registered agent. In response, WCL re-served Cincinnati at its Ohio corporate headquarters and Cincinnati does not contend that this service was improper. Thus, Cincinnati's request for dismissal under Rule 12(b)(5) is denied as moot.

reasons that follow, WCL's motion to remand is denied and Cincinnati and Valley's motions are granted.

## BACKGROUND

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the complaint as true and views those facts in the light most favorable to WCL as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

As alleged, WCL is a company based in the Chicago metropolitan area that provides private, for-hire transportation services both inside and outside of Illinois. (Compl. ¶ 7, Dkt. No. 1-1.) On June 1, 2019, WCL used its insurance agent, Valley, to obtain an all-risk insurance policy from Cincinnati ("Policy"). (*Id.* ¶¶ 4–5, 11.) Under the Policy, Cincinnati agreed to provide WCL with businessowner's coverage for losses to WCL's business property, business personal property, and business income. (*Id.* ¶¶ 4, 10.) As an all-risk policy, the Policy generally covered direct physical loss or damage to WCL's insured properties unless specifically excluded. (*Id.* ¶ 11.) The Policy was effective from June 1, 2019 through June 1, 2020. (*Id.* ¶ 6.)

Like many businesses, WCL's operations were significantly disrupted by the COVID-19 pandemic. (*Id.* ¶ 22.) COVID-19 is a highly contagious and potentially fatal virus that can be transferred directly between people or via surfaces. (*Id.* ¶¶ 12–13.) By some scientific accounts, COVID-19 can remain active on surfaces for several days. (*Id.* ¶ 14.) On March 20, 2020, the Governor of Illinois responded to the pandemic by issuing Executive Order 2020-10, which instituted a mandatory stay-at-home order for the State of Illinois. (*Id.* ¶ 19.) The order allowed for limited travel as necessary for "essential activities," subject to appropriate social distancing. (*Id.*) Transportation service providers were allowed to remain in operation as an essential business so long as they regularly cleaned high-touch surfaces. (*Id.* ¶¶ 19, 21.)

According to WCL, its business premises have been directly exposed to individuals who have tested positive for COVID-19. (*Id.* ¶ 22.) And given the high number of reported COVID-19 cases in the Chicago area, WCL asserts that the known exposures represent a small fraction of the business's contacts with COVID-19. (*Id.* ¶ 23.) Consequently, WCL claims that the COVID-19 pandemic and the associated lockdown orders have effectively rendered WCL's business inoperable by limiting access to its business premises for the protection of the general public. (*Id.* ¶ 24.) Through Valley, WCL filed a loss claim with Cincinnati on March 20, 2020. (*Id.* ¶ 31.) Cincinnati responded to WCL's claim with a reservation-of-rights letter asserting that the COVID-19 pandemic did not cause direct physical loss or damage to property as required for coverage under the Policy. (*Id.* ¶ 33.) Ultimately, Cincinnati denied WCL's claim on May 12, 2020. (*Id.* ¶ 35.)

Shortly thereafter, WCL filed a declaratory judgment action in Illinois state court, seeking a declaration that Cincinnati was obligated to cover its business interruption losses from the COVID-19 pandemic. (*Id.* ¶ 41.) WCL claims coverage pursuant to the following provisions of the Policy:

> (1) Business Income
>
> (a) We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct "loss" to property at the "premises" caused by or resulting from any Covered Cause of Loss.
>
> . . . .
>
> (2) Extra Expense
>
> (a) We will pay necessary Extra Expense you sustain during the "period of restoration." Extra Expense means necessary expenses you sustain . . . during the "period of restoration" that you would not have sustained if there had not been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

3

> . . . .
>
> (3) Civil Authority
>
> When a Covered Cause of Loss causes damage to property other than Covered Property at the described "premises," we will pay for the actual loss of Business Income and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises," provided that both of the following apply:
>
> (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
>
> (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property

(*Id.* ¶ 25.) The Policy defines "Covered Cause of Loss" to mean "direct 'loss' unless that 'loss' is excluded or limited." (*Id.* ¶ 26.) Further, "loss" is defined to mean "accidental physical loss or accidental physical damage." (*Id.* ¶ 27.) Viewing those provisions together, WCL claims, the Policy gives a broad meaning to the term "physical loss" such that it unambiguously encompasses losses stemming from the interruption to its business caused by the COVID-19 pandemic. (*Id.* ¶ 30.) Nor are there exclusions in the Policy for direct physical loss caused by a "virus," "Act of God," "*force majeure*," "global pandemic," or "mass catastrophe." (*Id.* ¶ 28.)

After WCL initiated its declaratory judgment action in Illinois state court, Cincinnati removed it to this Court on the basis of diversity jurisdiction. (Notice of Removal, Dkt. No. 1.) Subsequently, Cincinnati and Valley each filed motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) (Dkt. Nos. 11, 14), and WCL filed a motion to remand the action back to state court (Dkt. No. 18).

## DISCUSSION

### I. WCL's Motion to Remand and Valley's Motion to Dismiss

"When a plaintiff files suit in state court but could have invoked the original jurisdiction of the federal courts, the defendant may remove the action to federal court." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009); *see also* 28 U.S.C. § 1441(a). The party seeking removal bears the burden of establishing federal jurisdiction and a district court is to "interpret the removal statute narrowly, resolving any doubt in favor of the plaintiff's choice of forum in state court." *Id.* Here, Cincinnati seeks to involve this Court's diversity jurisdiction, pursuant to which a federal district court has jurisdiction over cases when the parties are citizens of different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a).

WCL argues three bases for the Court to remand this case. First, WCL claims that Cincinnati has failed to establish that there is complete diversity between the parties because both WCL and Valley are Illinois citizens. In response, Valley and Cincinnati contend that Valley is not a proper party in this action, which is also the basis for Valley's motion to dismiss for failure to state a claim. While a district court normally must ensure that it has subject-matter jurisdiction before addressing arguments made under Rule 12(b)(6), *e.g.*, *Kuhl v. Guitar Ctr. Stores, Inc.*, No. 07 C 214, 2008 WL 656049, at *3 (N.D. Ill. Mar. 5, 2008), the Court will simultaneously address Valley's Rule 12(b)(6) motion and the complete diversity analysis because they rest on the same issues. WCL also claims that Cincinnati has failed to satisfy § 1332(a)'s amount-in-controversy requirement. And finally, even if this Court has diversity jurisdiction, WCL asks that this Court decline to exercise its jurisdiction to issue a declaratory judgment and instead remand the matter to state court.

5

### A. Complete Diversity

"Under the rule of complete diversity, if there are residents of the same state on both sides of a lawsuit, the suit cannot be maintained under the diversity jurisdiction even when there is also a nonresident party." *Krueger v. Cartwright*, 996 F.2d 928, 931 (7th Cir. 1993). Here, there is no dispute that there is diversity of citizenship between WCL and Cincinnati. As an LLC, WCL's citizenship is determined by the citizenship of each of its members. *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007). In its notice of removal, Cincinnati identifies each member of WCL as an Illinois resident. (Notice of Removal ¶¶ 8–9.) Thus, WCL is an Illinois citizen for purposes of the diversity analysis. On the other hand, Cincinnati (*i.e.*, each of the component entities) is a corporation and is therefore deemed to be a citizen of the state in which it was incorporated and the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). And Cincinnati states that it is an Ohio corporation with its principal place of business there. (Notice of Removal ¶ 11.) Given that no member of WCL is a citizen of Ohio, there is diversity of citizenship between WCL and Cincinnati.

As for Valley, it is a corporation organized in Illinois with its principal place of business there. (Compl. ¶ 3; Notice of Removal ¶ 12.) Normally, Valley's presence as a Defendant would destroy complete diversity because it is a citizen of the same state as WCL. However, both Cincinnati and Valley argue that Valley's citizenship should not be considered because WCL's complaint sets forth no actual claim against Valley and names Valley as a Defendant solely to defeat federal jurisdiction.

Under what is known as the fraudulent joinder doctrine, "an out-of-state defendant's right of removal premised on diversity cannot be defeated by joinder of a nondiverse defendant against whom the plaintiff's claim has no chance of success." *Morris v. Nuzzo*, 718 F.3d 660, 666 (7th

Cir. 2013) (internal quotation marks omitted). A removing defendant bears a heavy burden in establishing fraudulent joinder and "must show that, after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." *Id.* (internal quotation marks omitted). The Seventh Circuit has described this standard as even more favorable to the plaintiff than the Rule 12(b)(6) standard. *Schur*, 577 F.3d at 764. "[I]n most cases, fraudulent joinder involves a claim against an in-state defendant that simply has no chance of success, whatever the plaintiff's motives." *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992). Once a removing defendant has established the fraudulent joinder of a nondiverse defendant, the district court may "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over [the] case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Schur*, 577 F.3d at 763.

WCL argues that Valley is a proper party because Valley, acting as Cincinnati's agent, assisted WCL in procuring the Policy and served as an intermediary in the claims process. But the only relief WCL seeks in this action is a declaration of Cincinnati's coverage obligations under the Policy. Valley is not a party to the Policy and has no obligations to WCL other than to process its claims. Other courts have found fraudulent joinder when a plaintiff names a nondiverse insurance agent who is not a party to the underlying insurance contract as a defendant to claims solely concerning an insurer's coverage obligations. *See, e.g.*, *Bodine's, Inc. v. Fed. Ins. Co.*, 601 F. Supp. 47, 49–50 (N.D. Ill. 1984) (holding that there was no reasonable basis to believe that Illinois contract law would impose liability on nondiverse insurance agents that neither issued nor were parties to the insurance contract); *Anderson v. Home Ins. Co.*, 724 F.2d 82, 84–85 (8th Cir. 1983) (dismissing nondiverse insurance agent as fraudulently joined because the plaintiff could not state a wrongful denial of coverage claim against a non-party to the insurance contract); *see*

7

*also Tafco Corp. v. SMA Life Assurance Co.*, No. 85 C 4479, 1985 WL 2109, at *1 (N.D. Ill. July 11, 1985) ("[B]ecause [the insurance agent] is not a party to the insurance contract, he cannot be held liable for the contract's breach, and he is not a proper defendant in this case.").

To the extent WCL asserts that Valley should remain in this action because of its involvement in "a conspiracy of predetermined coverage denial suggestive of bad faith dealings and breach of duties in tort not yet at issue at this time" (WCL's Reply in Supp. of Mot. for Remand at 4, Dkt. No. 28), it cannot defeat fraudulent joinder on the basis of an unpleaded claim. Indeed, a defendant "need not negate any possible theory that [the plaintiff] might allege in the future: only his present allegations count." *Poulos*, 959 F.2d at 74. And here, Valley is not implicated in the declaratory relief sought in the complaint. For that reason, the Court concludes that Valley was fraudulently joined, its citizenship is disregarded in the diversity jurisdiction analysis, and it is dismissed from the case. Accordingly, Valley's motion to dismiss is granted.

### B. Amount in Controversy

WCL also claims that Cincinnati has not met its burden to establish this Court's diversity jurisdiction because it has not demonstrated that the amount in controversy exceeds $75,000. When removing a case to federal court, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). But "once that allegation is called into question . . . the defendant must 'prove its jurisdictional facts by a preponderance of the evidence.'" *Midland Mgmt. Co. v. Am. Alt. Ins. Co.*, 132 F. Supp. 3d 1014, 1018 (N.D. Ill. 2015) (quoting *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006)). If the defendant can make the requisite showing, "the plaintiff can defeat jurisdiction only if 'it appears to a legal certainty that the claim is really for less than the jurisdictional amount.'" *Oshana v.*

8

*Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006) (quoting *St. Paul Mercury Indem. Co. v. Red Cab. Co.*, 303 U.S. 283, 289 (1938)).

For a declaratory judgment action, the amount in controversy is measured by the value of the object of the litigation. *Am.'s MoneyLine, Inc. v. Coleman*, 360 F.3d 782, 786 (7th Cir. 2004). Here, the object of the litigation is the amount of losses WCL sustained because of the COVID-19 pandemic for which it seeks indemnification from Cincinnati pursuant to the Policy. While WCL's complaint does not actually estimate the amount of its covered losses, in its notice of removal, Cincinnati states that given the nature and duration of WCL's alleged COVID-19-related losses, the amount in controversy will exceed $75,000. (Notice of Removal ¶ 18.) After WCL questioned that allegation in its motion to remand, Cincinnati came forward with evidence of WCL's application for a Paycheck Protection Program loan from the Small Business Administration[2] in the amount of $1–2 million, which was approved on April 6, 2020. That loan is persuasive evidence that, at the time it sought the loan, WCL anticipated substantial losses in excess of $75,000 from the pandemic. The only argument WCL musters in response is that Cincinnati will not be able to meet the amount-in-controversy requirement because WCL seeks only a declaration of rights and obligations and therefore there is no amount in controversy. But that contention ignores that the amount in controversy is determined by the value of what WCL stands to gain if it obtains the requested declaration.

In short, Cincinnati has adequately set forth evidence showing that the amount in controversy likely exceeds $75,000. Because Cincinnati and WCL are citizens of different states, Cincinnati has sufficiently demonstrated that this Court has diversity jurisdiction over the action.

---

[2] The Paycheck Protection Program was established to provide loans "to help businesses keep their workforce employed" during the COVID-19 pandemic. *Paycheck Protection Program*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program (last visited Oct. 8, 2021).

C.     **Abstention**

As an alternative basis for remand, WCL requests that this Court decline exercising jurisdiction to issue a declaratory judgment. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). As discussed above, this Court has diversity jurisdiction over this action. Nonetheless, "[u]nder what is known as the *Wilton*/*Brillhart* abstention doctrine, district courts possess significant discretion to dismiss or stay claims seeking declaratory relief, even though they have subject[-]matter jurisdiction over such claims." *R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 713 (7th Cir. 2009). The doctrine is rooted in the Supreme Court's decision in *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942), and its continuing vitality was later reaffirmed by *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). As the Supreme Court explained in *Wilton*:

> By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or dismiss an action seeking declaratory judgment before trial or after all arguments have drawn to a close. In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.

*Wilton*, 515 U.S. at 288. Often, a court will abstain under *Wilton*/*Brillhart* "where a declaratory judgment is sought and parallel state proceedings are ongoing." *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 (7th 2010).

Although WCL acknowledges that there is not an ongoing parallel state proceeding, it nonetheless argues that the Court should abstain because Illinois courts have a greater interest in and are better suited to handle a lawsuit involving an insurance policy regulated by Illinois law. It

10

is true that the Seventh Circuit has stated that a district court has discretion to decline to hear a declaratory judgment action even when there is no parallel proceeding. *Med. Assurance Co. v. Hellman*, 610 F.3d 371, 379 (7th Cir. 2010). At the same time, much of the caselaw surrounding the *Wilton*/*Brillhart* doctrine presupposes a parallel proceeding. *See id.* ("[P]arallel proceedings do figure in the holding of *Wilton*."); *see also Runk v. United Fire & Cas. Co.*, No. 4:09 CV 43, 2009 WL 3256806, at *5 (N.D. Ind. Oct. 7, 2009) ("[T]he test developed by the Seventh Circuit in the wake of *Brillhart* and *Wilton* makes little sense where there is no parallel state court proceeding to which the court can compare the federal case."). Indeed, WCL has not identified any Seventh Circuit caselaw addressing the Court's exercise of discretion under *Wilton*/*Brillhart* when there is no parallel proceeding.

Ultimately, the Court declines to remand this case to state court on the basis of *Wilton*/*Brillhart* because WCL has not shown that the issues presented by this action are better settled in state court. *See Brillhart*, 316 U.S. at 495 ("Where a district court is presented with a [declaratory judgment claim] it should ascertain whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can be better settled in the proceeding pending in the state court."). Here, WCL's declaratory judgment claim concerns the proper interpretation of an insurance contract, a matter no different from many other contract cases a federal court hears under its diversity jurisdiction. *See, e.g.*, *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013) ("Under Illinois law, an insurance policy is a contract, and the general rules governing the interpretation of other types of contract also govern the interpretation of insurance policies." (internal quotation marks omitted)). Indeed, as discussed below, countless federal courts have already issued decisions on whether businessowners' insurance policies cover COVID-19-related losses. Moreover, abstaining would

11

contravene "[t]he goal of the Declaratory Judgment Act [of] allow[ing] for the efficient resolution of disputes by an early adjudication of the rights of the parties." *Med. Assurance Co.*, 610 F.3d at 377. Cincinnati's potentially dispositive motion to dismiss is presently before this Court and WCL has given the Court no good reason to not issue a decision in favor of sending the case back to square one in state court.

In sum, the Court has diversity jurisdiction over WCL's claim for declaratory judgment and will not decline to exercise that jurisdiction. Therefore, WCL's motion for remand is denied and the Court will proceed to address Cincinnati's Rule 12(b)(6) motion.

## II.     Cincinnati's Motion to Dismiss

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Cincinnati argues that WCL's claim for declaratory judgment fails as a matter of law because the Policy only indemnifies against physical loss or damage to property and the COVID-19 virus did not cause any tangible physical alteration to WCL's business premises.

Each provision of the Policy that WCL claims gives rise to Cincinnati's coverage obligations requires that there be a "direct 'loss'" to property, with "loss" meaning "accidental physical loss or accidental physical damage." (Compl. ¶¶ 25–27.) Thus, for Cincinnati's coverage

obligations to be triggered, WCL would have to show that the COVID-19 virus caused direct physical loss or physical damage to property on its premises. The question before this Court is whether the presence of COVID-19 positive individuals at WCL's premises caused physical loss or physical damage within the meaning of the Policy.

As discussed above, in Illinois, an insurance contract is interpreted as any other contract. *Wehrle*, 719 F.3d at 842. The policy "is to be construed as a whole [and] [i]f the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). "However, if the words used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter." *Id.* Ambiguity is not based on "whether creative possibilities can be suggested. Reasonableness is the key." *Bruder v. Country Mut. Ins. Co.*, 620 N.E.2d 355, 362 (Ill. 1993). Whether a contract is ambiguous is a question of law for the court. *Cent. Ill. Light Co.*, 821 N.E.2d at 214.

While WCL does not contend that COVID-19 caused "physical damage" to its property, insofar as that term requires some tangible physical alteration to property, it asserts that it nonetheless suffered a "physical loss." The crux of WCL's argument is that COVID-19 viral particles physically attached to the various surfaces of WCL's premises, rendering them unusable due to the high risk of infection. According to WCL, its inability to use its business property due to the physical presence of COVID-19 on its premises constituted a "physical loss" to property, as defined in the Policy. WCL further contends that Cincinnati's insistence that there be a physical alteration to property erases the distinction necessarily created by the Policy's use of the disjunctive "or" in the phrase "accidental physical loss *or* physical damage."

13

The Court does not address the issues presented here on a blank slate. As an initial matter, the Seventh Circuit has, in the insurance context, previously interpreted the word "physical" when used in conjunction with "loss" as "generally refer[ing] to tangible as opposed to intangible damage." *Windridge of Naperville Condo. Ass'n v. Phila. Indem. Ins. Co.*, 932 F.3d 1035, 1040 (7th Cir. 2019). Citing the Illinois Supreme Court's interpretation of the phrase "physical injury," the Seventh Circuit elaborated that tangible damage "unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Id.* at 1040 n.4 (quoting *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 502 (Ill. 2001). Thus, the Seventh Circuit concluded that an insurer's obligation to cover "direct physical loss" to property meant that it had to cover "property that has been damaged." *Id.* at 1040.

The Seventh Circuit has also addressed the distinction between loss and damage in an insurance policy that defined "loss," as used in the phrase "direct physical loss," to mean "accidental loss or damage." *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 747 (7th Cir. 2015) (applying Wisconsin law). It found that "loss" referred to harm from diminishment in value or function whereas damage referred to changes to the property's physical characteristics that do not measurably diminish the property's value or function. *Id.* ("[E]ven without a measurable 'loss' in value or in function, the policy expressly contemplates the possibility that there may still be 'damage,' presumably giving it a different meaning than the word 'loss.'" (internal quotation marks omitted)). Applying those cases here, the Court interprets "physical loss" to mean a physical alteration to property that causes a diminishment of function or value.

That is the same interpretation adopted by the vast majority of courts in this District and throughout the country that have addressed COVID-19-related insurance coverage disputes like the one here. *E.g.*, *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20 CV 2160, 2020 WL

14

5630465 (N.D. Ill. Sept. 21, 2020) ("The critical policy language here—'direct physical loss'—unambiguously requires some form of actual, physical damage to the insured premises to trigger coverage."); *Uncork & Create LLC v. Cincinnati Ins. Co.*, No. 2:20-cv-00401, 2020 WL 6436948, at *4–5 (S.D. W. Va. Nov. 2, 2020) (adopting the position that there must be a physical alteration to property to establish a physical loss to property); *Plan Check Downtown III, LLC v. AmGuard Ins. Co.*, No. Cv 20-6954-GW-SKx, 2020 WL 5742712, at *5 (C.D. Cal. Sept. 10, 2020) ("The weight of California law also appears to require some tangible alteration, no matter whether the trigger language uses 'loss' or 'damage.'").[3] The question then is whether the COVID-19 virus physically alters property such that it causes a "physical loss" to property. Again, the vast majority of courts have found that COVID-19 does not cause such a loss because it "does not physically alter the appearance, shape, color, structure, or other material dimension of the property." *Sandy Point Dental*, 2020 WL 5630465, at *2. It is true that where, as here, the virus is physically present on the business premises, the viral particles may attach to surfaces and remain active and infectious for hours or even days, rendering the affected property dangerous for its usual purposes due to the risk of infection. Yet courts have emphasized that the virus's "presence on surfaces can be eliminated with disinfectant." *Uncork & Create*, 2020 WL 6436948, at *5. Given the ease with which the virus can be removed by routine cleaning, it cannot be said that it damages or otherwise physically alters the property with which it comes in contact. *E.g.*, *Unmasked Mgmt., Inc. v. Century-Nat'l Ins. Co.*, No. 3:20-cv-01129-H-MDD, 2021 WL 242979, at *6 (S.D. Cal. Jan. 22, 2021) ("If, for example, a sick person walked into one of Plaintiffs' restaurants and left behind COVID-19 particulates on a countertop, it would strain credulity to say

---

[3] While Cincinnati's motion to dismiss was pending, both Cincinnati and WCL filed motions to supplement their briefs with additional authority, namely, new district court decisions addressing similar COVID-19-related insurance coverage disputes as here. (Dkt. Nos. 45, 46, 48.) Those motions are granted and the authority has been considered.

that the countertop was damaged or physically altered as a result. After all, disinfectant and other cleaning methods can be used to remove or lessen the virus from surfaces.); *see also Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020) ("[A]n item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'").

In urging this Court to reach the contrary conclusion, WCL relies heavily on an out-of-Circuit case that found that the presence of COVID-19 on a business's premises causes a "physical loss." *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794 (W.D. Mo. 2020). There, the district court first concluded that "even absent a physical alteration, a physical loss may occur when the property is uninhabitable or unusable for its intended purpose." *Id.* at 801. Thus, it reasoned that the plaintiffs had pleaded a physical loss to property because they had "plausibly alleged that COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable." *Id.* at 802–03. However, the district court's conclusion was largely based on its interpretation of non-Seventh-Circuit caselaw whereas, as discussed above, the Seventh Circuit has found that a physical loss requires some tangible physical alteration to the property. Moreover, even the cases relied on in *Studio 417* involved some long-term defect to the injured property that could not be remedied with routine cleaning. *Id.* at 801 (citing cases finding "physical loss" caused by brown recluse spider infestation, asbestos contamination, and mold contamination).

Recently, two courts in this District have concluded that a reasonable jury could find the term "physical loss" broad enough to encompass a business's deprivation of the use of its business premises due to COVID-19. *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, No. 20 C 2806, 2021 WL 767617, at *3–5 (N.D. Ill. Feb. 28, 2021); *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, MDL No. 2964, 2021 WL 679109, at *8–10 (N.D. Ill. Feb. 22,

16

2021). Both those courts took issue with interpreting the term "physical loss" to unambiguously require a tangible physical alteration to property because that interpretation rendered "physical loss" redundant of "physical damage." *See Derek Scott Williams PLLC*, 2021 WL 767617, at *4; *In re Soc'y Ins. Co.*, 2021 WL 679109, at *8. But neither decision discusses the Seventh Circuit case law addressed above, nor do they attempt to distinguish the many district court decisions that reach a contrary conclusion. Moreover, the Court does not believe that its interpretation of "physical loss" renders one of the phrases "physical loss" and "physical damage" superfluous. As aptly explained by another court in this District:

> [C]onsider a thief who attempts to steal a desktop computer. If the thief succeeds, the computer is "physically lost" but not necessarily "physically damaged." If the thief cannot lift the computer, so instead of stealing it takes a hammer to its monitor in frustration, the computer would be "physically damaged" but not physically lost." Yet if the thief were only to change the password on the system so that employees could not log in, there would be neither "physical damage" nor "physical loss," though the computer would be unusable for some while. The Business Income provision might cover the first two cases, but it does not cover the third.
>
> In fact, it is [the insured's] interpretation that would violate the surplusage-avoidance principle by reading the word "physical" out of the Business Income provision. After all, if the mere loss of use were covered, what would be the difference between "direct loss" and "direct *physical* loss"?

*Chief of Staff LLC v. Hiscox Ins. Co.*, No. 20 C 3169, 2021 WL 1208969, at *3 (N.D. Ill. Mar. 31, 2021) (alterations omitted). That illustration persuasively demonstrates how the two phrases can be given independent effect, thereby reinforcing this Court's conclusion that "physical loss" requires some physical alteration to the property.[4]

Finally, WCL points to the Policy's use of the term "Property Damage" to argue that it need not allege a physical alteration to property. That term is defined to mean:

---

[4] As the district court noted in *Chief of Staff*, "disagreement among courts regarding the interpretation of an insurance policy provision does not, by itself, render the provision ambiguous." *Chief of Staff*, 2021 WL 1208969, at *4 (citing *Erie Ins. Grp. v. Sear Corp.*, 102 F.3d 889, 894 (7th Cir. 1996)).

17

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

WCL argues that the determination of whether there is "physical damage" to property for purposes of the term "loss" must be construed in light of the fact that "Property Damage" explicitly encompasses the loss of use of property that is not physically injured. However, the term "Property Damage" has no relevance to the provisions at issue here because it applies only to WCL's separate general liability coverage protecting WCL from legal claims for damages brought against it by others. That coverage is set out in a separate form and its definitions are not incorporated in the coverage forms at issue here. (*See generally* Compl., Ex. 1 at PageID #115–37, Dkt. No. 1-2.)

In short, the Court finds that the unambiguous meaning of "physical loss" to property requires that there be some tangible physical alteration to the affected property. And because COVID-19 did not cause any physical change to any property at WCL's business premises, Cincinnati had no obligation to cover WCL's losses from the COVID-19 pandemic. Consequently, Cincinnati's motion to dismiss is granted.

## CONCLUSION

For the foregoing reasons, WCL's motion to remand (Dkt. No. 18) is denied, and Valley and Cincinnati's motions to dismiss (Dkt. Nos. 11, 14) are granted.

ENTERED:

Dated: October 14, 2021

_____
Andrea R. Wood
United States District Judge